**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 490587-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| RICHARD CARL BRUCE, JR., | |
| Appellant. | |

BJORGEN, C.J. — Richard Carl Bruce Jr. appeals his conviction for second degree assault and violation of a no-contact order.

In response to Bruce's arguments, we hold that (1) the trial court erred by ordering Bruce physically restrained for the entire trial but that the error was harmless, (2) the trial court did not (a) abuse its discretion by finding defense counsel had opened the door to additional testimony about an argument between Bruce and Elizabeth Sanchez and Bruce's prior assault of Sanchez, but (b) abused its discretion when it determined that testimony concerning the prior assault of Sanchez was not unfairly prejudicial relative to its probative value, and (3) the State committed prosecutorial misconduct by commenting on Bruce's silence at trial. We also decline to exercise our discretion on the matter of appellate costs.

Consequently, we vacate Bruce's convictions and remand for a new trial.

FACTS

Prior to the events of this case, Bruce had been convicted of second degree assault of Sanchez in 2015. On March 17, 2016, while Sanchez and Bruce were in Sanchez's recreational vehicle (RV), Bruce remarked that he should not have been convicted of previously assaulting Sanchez. Sanchez became upset by Bruce's comment and the two began arguing. While they

were arguing, Bruce grabbed her throat with his hands, but tripped over a radiator heater on the floor in the process, causing both of them to fall to the floor. Sanchez attempted to scream, but Bruce placed his hands over her mouth and told her to be quiet. Bruce then left the RV, taking Sanchez's phone with him. Sanchez called 911 on another phone and while she was speaking with law enforcement, Bruce returned to the trailer, gave Sanchez her phone, and departed.

The State charged Bruce with first degree burglary, second degree assault, violation of a post-conviction no-contact order, and interfering with the reporting of domestic violence.[1] At trial, the court considered argument on whether Bruce should be restrained during trial. Deputy Ricardo Gordon from the Thurston County Corrections Department testified that Bruce was at the time restrained by a mechanical leg restraint secured under his pant leg that prevented him from running or kicking but permitted him to sit and walk. Gordon stated that while Bruce did not have any disciplinary history while in custody, he was classified as maximum security due to the nature of his charges and the amount of bail set. Gordon also explained that while different restraint devices were available, such as a handcuffs, other forms of leg restraints, or a "Taser device," the alternatives were either disproportionately restrictive or would have been visible to the jury during trial and that in the absence of any restraint device, a third deputy would be required to monitor Bruce. The State also argued that some form of restraint would be appropriate because the victim, Sanchez, was expected to testify. Defense counsel responded that restraints would not be appropriate because Bruce had no disciplinary violations and did not otherwise exhibit violent behavior while in custody.

---

[1] The State also charged domestic violence enhancements as part of the burglary, second degree assault, and violation of a no-contact order charges.

In making its ruling, the trial court recognized that it needed to weigh a number of factors in determining whether restraints are necessary, and if so, what type would be appropriate. The trial court considered the seriousness of the charges, Bruce's temperament and character, Bruce's history of disruptive behavior, the availability of less restrictive alternatives, Bruce's age and physical attributes, his criminal record, past escapes, or attempted escapes, whether he had threatened to harm others or cause a disturbance, any evidence of self-destructive tendencies, any risk of mob violence or rescue attempt, the likely size and the mood of the audience, the nature and physical security of the courtroom, and the number of corrections deputies that would be needed if restraints were not imposed.

In considering less restrictive alternatives, the court noted that the device Bruce was wearing was the "least restrictive restraint that the Court is aware of that we have here at Thurston County absent the defendant appearing in court with no restraint whatsoever." Verbatim Report of Proceedings (VRP) (May 24, 2016) at 24-28. The court stated further that

> [it] is a leg brace, which cannot be seen, and in a moment I will ask Mr. Bruce to stand so I can make my own visual determination as to whether it can be seen on him. The other type of restraints that would be available would be handcuffs or leg cuffs, as well as . . . the [Taser device], which is actually a device that can provide an electrical shock to a person, if they need to be subdued in any way. So the leg restraint is the least restrictive restraint that is available.
> . . . .
> [T]he Court cannot see the leg brace the way he is dressed, although certainly I did see that it affected his ability as he walked. I could see a slight change in his[,] what presumably is his normal gait.

VRP (May 24, 2016) at 25-26.

The court also considered

> the fact that the alleged victim in this case is the same person who is or was the victim of the crime for which Mr. Bruce has already been convicted, which was also a serious felony offense, the assault in the second degree, domestic violence, and that that person, Ms. Sanchez, is listed as a witness in this matter.

3

VRP (May 24, 2016) at 27.

The court then summarized its decision by stating:

So in consideration of all of those factors, the concern, in general, although we have in our larger courtroom at this time, the way our courtroom is set up, that any witnesses have to come down, they have to walk between two counsel table [sic], which are relatively close together, and then proceed up to the witness stand, and then come in close proximity to, in this case, the defendant in this matter. Same would be true and actually on a much smaller scale if we are moved to one of our smaller courtrooms.

And based upon all of that, I find that it is necessary that there be some form of restraint to ensure that the courtroom is safe for everyone, and I will authorize the use of the leg restraint.

I would indicate that if Mr. Bruce ultimately chooses to testify in this matter, then when he is called to testify, I will have him take the stand before the jury comes in, so that he will not have to walk in front of the jury. And, additionally, at the conclusion of his testimony, we will recess so that Mr. Bruce can leave the witness stand without having to walk in front of the jury, as well.

VRP (May 24, 2016) at 27-28.

During trial, Sanchez was cross-examined by defense counsel based on notes prepared by the defense's investigator, Dave Matthews, regarding a conversation that Sanchez had with Matthews on April 30, 2016:

| [Defense (D)]: | And prior to picking [Bruce] up, you had been at your ex-husband's house, correct? |
|---|---|
| [Witness (W)]: | Yes. |
| [D]: | And upon picking [Bruce] up, you were upset at that time, correct? |
| [W]: | Yes. |
| . . . . | |
| [D]: | Do you recall telling Mr. Matthews that it was – you returned around lunchtime to get something to eat [on March 17, 2016]? |
| [W]: | Most likely, that's usually when I get done. |
| [D]: | And it was around that time that you and Mr. Bruce got into this argument? |
| [W]: | I think it was more in the evening. |
| [D]: | So things were fine for a while? |
| [W]: | Yeah. |
| [D]: | But at some point things started to get heated? |
| [W]: | Yes. |

[D]:      And you told Mr. Matthews this in your interview?
[W]:      Yes.
[D]:      And at some point, you told, when asked about what happened next, you told Mr. Matthews that you became furious –
[W]:      Yes.
[D]:       – with Mr. Bruce?  And that your anger at your discussions caused you to proceed to yell and scream at [Bruce], correct?
[W]:      We both were.
[D]:      But you told Mr. Matthews that you yelled and screamed at [Bruce]?
[W]:      Yes.
[D]:      And you told him that you got into his face?
[W]:      After the fact of him getting in mine.
[D]:      Okay.  But you told Mr. Matthews –
[W]:      Yes.
[D]:       – that you got into his face and you started to call him names, correct?
[W]:      Yes, we both did.

VRP (May 25, 2016) at 110-13.

After the defense finished cross-examining Sanchez, the jury was excused from the courtroom and the State argued that defense counsel had opened the door for additional testimony regarding the argument between Sanchez and Bruce and that the testimony would be admissible under the res gestae exception to ER 404(b).  The State contended that:

> Today, on cross-examination, defendant asked her about the substance of the argument prior to the assaultive acts, specifically that Ms. Sanchez was unhappy about her husband and that she was discussing that and she was discussing that with the defendant and that she became upset and he became upset.
> That account leaves out a critical phase in the argument, which is that after Mr. Bruce and Ms. Sanchez were discussing her ex-husband, the defendant then turned to a discussion about their previous incident of domestic violence and how he could have beat that charge and should have beat that charge, and at that point, that's when the anger happened.
> According to Ms. Sanchez's initial statement to the deputy, when [Bruce] started making comments about how he could have beat the charge, she a [sic] became wary, if you will, and asked him to leave.
> According to the account she gave Mr. Matthews, the private investigator, is that after the defendant indicated he could have beaten the charge and should not have taken the deal, she became furious.  So under either account, that is a critical

5

phase of the argument, because right now the jury is simply believing that [sic] we are led to believe that Ms. Sanchez just became upset over some sort of transfer[red] anger towards her husband, her ex-husband, and that's simply not the case.

The escalation and the argument under both accounts came [in] when the defendant started discussing how basically he had gone down for a charge that he shouldn't have that involved her. Under 404(b), there is an exception for res gestae type information.

VRP (May 25, 2016) at 125-27.

After hearing argument from the defense, the court determined that defense counsel had opened the door to further questioning regarding the content of the argument between Sanchez and Bruce:

During the State's examination of Ms. Sanchez, the State abided by the Court's ruling and simply elicited testimony that indicated that Ms. Sanchez and Mr. Bruce were in an argument on March 17, 2016, which later then led to the alleged assault.

On cross-examination . . . [i]t is clear to the Court that the questioning about the argument, by questioning this witness about her response, which as she described and as she apparently indicated in an interview, is quite extreme, the words [sic] she was furious, that she yelled and screamed, that she got in Mr. Bruce's face, that she called him names, and it's really at this point unexplained as to how she could have gotten so upset over just an argument, and that the information related to what the argument was about and why she would get so upset and agitated and have such an extreme response is the res gestae, and, therefore, could be admissible with the door being opened pursuant to that theory.

VRP (May 25, 2016) at 131-33.

The court also ruled that the probative value of the anticipated testimony regarding the argument was not outweighed by its potentially prejudicial effect:

As it relates to the issue as to whether or not the Court [sic] authorizing this whether or not the probative value is outweighed by the danger of unfair prejudice, certainly there is probative value. The probative value is to give a complete picture as to what had happened, to explain information that was elicited on cross-examination about the alleged victim's behaviors, what she was doing, how she reacted to the argument and to give, as I indicated, the complete picture of what was really happening.

The danger of the unfair prejudice is obvious, as well, and that is evidence of similar conduct by Mr. Bruce and the concern that the jury would view it as conformity instead of evidentiary to complete the picture and to the res gestae.

6

> If the Court were to authorize testimony that Mr. Bruce had been convicted of the identical charge I believe [sic] would be – the probative value would be outweighed by the danger of the unfair prejudice. However, testimony that Mr. Bruce has previously been convicted of assaulting Ms. Sanchez without the evidence as to what the exact charge was, and that is the identical charge that is before the Court today, is not unduly prejudicial, because there will be no evidence that it was the exact same crime.
>
> . . . .
>
> My understanding of what the facts are is that the argument was about the fact that Mr. Bruce had been previously charged with a crime, that he was saying he could have beat those facts, and he ultimately was convicted.
>
> This is what I expect is going to be elicited, not what happened during that other incident but that the argument was about the fact that he had been previously charged and he was saying that he could beat that and that made her angry, but not what the charge was except that it was an assault charge.

VRP (May 25, 2016) at 137-39. Sanchez subsequently testified that she had been arguing with Bruce about his prior unrelated plea agreement, in which he pled guilty to assaulting Sanchez.

The defense called Bruce as a witness and questioned him regarding his interaction with law enforcement when he was arrested:

> [D]: And [Deputy Potis] placed you under arrest at that point?
> [W]: Yes, he did.
> [D]: And he read you your *Miranda*[2] rights?
> [W]: Yes, he did.
> [D]: He didn't give you an opportunity to make a statement prior to placing you under arrest?
> [W]: No.
> [D]: Didn't give you an opportunity to tell your side of the story?
> [W]: No.
> [D]: So you invoked your constitutional rights at that point?
> [W]: Yes, sir.
> [D]: Because it was pretty clear were [sic] you going to be arrested?
> [W]: Yeah.
> [D]: And your side of the story wasn't going to matter, was it?
> [W]: Right.

VRP (May 25, 2016) at 197-98.

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

On cross-examination, the State further inquired into the conversation between Bruce and

Deputy Potis:

> [State]: Isn't it true when you talked to Dep. Potis, you never told him that [Sanchez] had a seizure?
> [W]: No, ma'am.
> [State]: But he advised you of your constitutional rights under *Miranda*, correct?
> [W]: Yes.
> . . . .
> [State]: We will talk about what you asked him in a minute, but right now I'm asking you, isn't it true that he asked you whether or not you wished to talk to him?
> [W]: He did.
> [State]: And you declined that opportunity; is that right?
> [W]: I did, yes.
> [State]: So you had the opportunity to talk to him about [Sanchez] having a seizure; isn't that true?
> [W]: That's true.
> [State]: You had the opportunity to talk to him about how you needed to get out of that because [Sanchez] was angry at you and she just needed to calm down; isn't that true?
> [W]: Sure.
> [State]: You had the opportunity to tell him you were just out walking around to cool off, right?
> [W]: Yes, right.
> [State]: You had the opportunity to tell him you weren't trying to hide from him, you were just out walking around; isn't that true?
> [W]: That's true.
> [State]: But you waived that opportunity?
> [W]: I guess.
> [State]: And the reason you did that is because you knew that you had strangled her, isn't that true?
> [W]: Not true.

VRP (May 25, 2016) at 219-20.  Bruce did not object to this line of questioning.

In closing argument, the State in part focused on challenging Bruce's credibility:

> Now, we know that [Bruce] did not give a statement to Dep. Potis, and that is totally fine.  The State is not saying that he should have or that he was wrong in doing so.  Absolutely not.  Everyone has a right to remain silent, and that is a constitutional right, and it's very important.  The reason that I bring it up is because it's important, since you don't know what account he would have given, had he not already heard everyone else's testimony.  So he had the opportunity.  He declined

8

it, which is totally in his rights, but then he takes the stand, and that is only after he heard what everyone else has to say.

Again, credibility, what is reasonable in light of all the other evidence? What makes sense?

. . . .

[Sanchez] was clear and consistent about what happened. [Bruce] was in her RV, that there was a no-contact order, that they had an argument when the defendant started talking about how he shouldn't have been convicted previously of assaulting her, that she tried to get away, and that's when [Bruce] put his hands around her neck and later tried to smother her.

VRP (May 25, 2016) at 266-68. Bruce did not object.

The jury found Bruce guilty of assault in the second degree and violating a no-contact order. Bruce appeals.

ANALYSIS

A.      Physical Restraint

Bruce argues that the trial court abused its discretion by requiring him to wear the leg restraint during trial and that his convictions should be reversed because the imposition of physical restraints was prejudicial. Bruce contends that he was prejudiced by the imposition of physical restraints because the jury may have inferred from Bruce's lack of movement that he was restrained.

The trial court has broad discretion to determine what security measures are necessary to maintain decorum in the courtroom and to protect the safety of its occupants. *State v. Damon*, 144 Wn.2d 686, 691, 25 P.3d 418 (2001). A trial court abuses its discretion if its decision is manifestly unreasonable, or is exercised on untenable grounds or for untenable reasons. *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003). A decision is based on untenable grounds or made for untenable reasons if it rests on facts unsupported by the record or was reached by applying the wrong legal standard. *Id*. A decision is manifestly unreasonable if the court, despite applying the correct legal standard to the supported facts, reaches an outcome that is

9

outside the range of acceptable choices, such that no reasonable person could arrive at that outcome. *Id.*

A defendant is entitled to appear at trial free from shackles except in extraordinary circumstances. *State v. Finch*, 137 Wn.2d 792, 842, 975 P.2d 967 (1999). Several reasons underpin this rule—the sight of a shackled defendant may suggest he is a dangerous and untrustworthy person, violate his presumption of innocence, restrict his ability to assist counsel, interfere with the right to testify in his own behalf, and/or deprive him of the full use of his faculties. *Damon*, 144 Wn.2d at 690-91.

Generally, shackles should "'be used only when necessary to prevent injury to those in the courtroom, to prevent disorderly conduct at trial, or to prevent an escape.'" *Damon*, 144 Wn.2d at 691 (quoting *State v. Hartzog*, 96 Wn.2d 383, 398, 635 P.2d 694 (1981)). In determining whether the use of restraints is justified, the trial court may consider the following factors:

> "[T]he seriousness of the present charge against the defendant; defendant's temperament and character; his age and physical attributes; his past record; past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and the mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies."

*Id.* (quoting *Hartzog*, 96 Wn.2d at 400). The trial court must make its decision based on a factual basis set forth in the record, *Hartzog*, 96 Wn.2d at 400, and should allow the use of restraints only after conducting a hearing and entering findings into the record that are sufficient to justify the use of the restraints. *Damon*, 144 Wn.2d at 691-92.

The trial court in this appeal found that the physical restraint was justified because of safety concerns for Sanchez, the physical layout of the anticipated courtroom, Bruce's escape

status from Department of Corrections at the time of the alleged assault, and because Bruce's prior and current assault charge involved disruptive and violent behavior. The court also considered the need for an additional corrections deputy if restraints were not imposed.

Based on the reasoning in *Finch*, the trial court reasonably exercised its discretion in restraining Bruce while Sanchez was testifying, because Sanchez was the victim of Bruce's prior assault and the present alleged assault by Bruce. However, the need to ensure Sanchez's safety did not support shackling Bruce for the entire trial, because there are no findings to suggest that Bruce posed any danger to anyone other than Sanchez. In addition, the need for additional corrections deputies if restraints were not used does not justify the routine imposition of physical restraints on criminal defendants, although it may be relevant in extraordinary cases where restraints are warranted.

In sum, neither the trial court's oral ruling nor the evidence in the record show the extraordinary circumstances necessary to justify shackling Bruce under *Finch* and *Damon.* The trial court abused its discretion by ordering Bruce restrained for the entirety of the trial, rather than only those portions when Sanchez would be testifying.

We review an erroneous imposition of physical restraints for harmless error. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 694, 101 P.3d 1 (2004). Our Supreme Court has held that the "defendant must show that the shackling 'had substantial or injurious effect or influence on the jury's verdict.'" *Id*. (quoting *State v. Hutchinson*, 135 Wn.2d 863, 888, 959 P.2d 1061 (1998)). In order to meet this burden, the defendant is required to show that, based on the record, the jury could observe the restraints or that the restraints substantially impaired the defendant's ability to assist in his trial defense. *State v. Monschke*, 133 Wn. App. 313, 336, 135 P.3d 966 (2006). The jury's observation of a defendant in restraints may prejudice the defendant because

the jury may subsequently infer that a defendant is restrained because he is particularly dangerous or untrustworthy. *Damon*, 144 Wn.2d at 693.[3]

In this case, the trial court abused its discretion by ordering Bruce physically restrained during the portions of the trial when Sanchez was not testifying. The record, however, demonstrates that the jury could not have been aware of Bruce's leg restraint. Prior to ordering restraints, the trial court examined Bruce as he stood and walked in the courtroom with the leg restraint attached and determined that the leg restraint was not visible. While the court noted that the restraint impaired Bruce's usual gait, the court also took measures to conceal this indication of restraint by having Bruce move to and from the witness stand outside the presence of the jury. Bruce suggests that the jury may draw negative inferences if a defendant is seated at a greater distance from the jury and others while testifying, but there is no indication in the record that Bruce was positioned any differently than other individuals in the courtroom.

In *State v. Clark*, our Supreme Court reasoned that although it was error to restrain Clark, he was not prejudiced because there was no observable indication to the jury that Clark was restrained. 143 Wn.2d 731, 777, 24 P.3d 1006 (2001). The court explained that Clark was not prejudiced because "[t]he trial court made sure Clark was not moved in or out of the room in the presence of the jury, both counsel tables had protective skirts, the shackles were taped to eliminate any noise, and the jury never saw Clark in motion during the guilt phase." *Id*. Similar to *Clark*, Bruce has not demonstrated that he was prejudiced by the restraint because there is no indication in the record that the jury could observe the restraint or any impairment caused by the restraint or otherwise draw a negative inference about Bruce because he was restrained.

---

[3] Because Bruce did not argue that his physical restraints interfered with his ability to assist in his defense, we do not consider whether he was prejudiced on this ground.

Therefore, we determine that the trial court's improper restraint of Bruce was harmless because Bruce has not shown that he was prejudiced as a result.

B.        Testimony Regarding the Argument Between Bruce and Sanchez

        1. Opening the Door[4]

        Bruce argues that the trial court erred by determining that defense counsel opened the door to additional testimony regarding the argument in the RV between Bruce and Sanchez.  We disagree.

        Under our case law, "[a] party's introduction of evidence that would be inadmissible if offered by the opposing party 'opens the door' to explanation or contradiction of that evidence." *State v. Ortega*, 134 Wn. App. 617, 626, 142 P.3d 175 (2006) (quoting *State v. Avendano-Lopez*, 79 Wn. App. 706, 714, 904 P.2d 324 (1995)).  We have previously noted that the open door rule "is intended to preserve fairness," by preventing the introduction of one-sided testimony that the opposing party has no opportunity to rebut.  *Avendano-Lopez*, 79 Wn. App. at 714.  Our Supreme Court has explained that:

> It would be a curious rule of evidence which allowed one party to bring up a subject, drop it at a point where it might appear advantageous to him, and then bar the other party from all further inquiries about it.  Rules of evidence are designed to aid in establishing the truth.  To close the door after receiving only a part of the evidence not only leaves the matter suspended in air at a point markedly advantageous to the party who opened the door, but might well limit the proof to half-truths.

*State v. Gefeller*, 76 Wn.2d 449, 455, 458 P.2d 17 (1969).

---

[4] Bruce argues in briefing that the trial court erred by determining that the argument between Bruce and Sanchez was part of the res gestae of the charges in this case.  However, the State appears to concede that the trial court's ruling reflects the application of the open door rule, despite the fact that it references the concept of res gestae at various points.  In its brief, the State specified that "rather than addressing res gestae, the State argues that the prior conviction was properly admitted under the open[ ] the door doctrine."  Br. of Resp't at 11.  In light of the State's acknowledgment, we address the arguments relating to the open door rule.

We review a trial court's determination that a party has opened the door for an abuse of discretion. *Ortega*, 134 Wn. App. at 626. The standards for an abuse of discretion are set out in Part A of the Analysis, above.

In this case, the trial court determined that defense counsel had opened the door to further testimony about the argument between Sanchez and Bruce through his questioning of Sanchez about her emotional state in response to the argument regarding Bruce's prior assault of Sanchez. The State argued that Sanchez's emotional reaction to the argument was "a critical phase of the argument," because without it the jury was led to believe that Ms. Sanchez "just became upset over some sort of transfer[red] anger towards her . . . ex-husband." VRP (May 25, 2016) at 127. The trial court agreed with the State and found that the door was opened because:

> [I]t does appear that there is an issue the defense, through their questions, have painted a situation where the alleged victim in this matter became infuriated, got in Mr. Bruce's face, calling him names, and that through these questions that she was completely out of control and extremely upset and angry and with no explaining as to how she could have gone from cooking dinner to that state, and that creates a false picture of what was really happening at that time, what the argument was truly about, or what was being exchanged as to when she got upset and why she got so upset like that.

VRP (May 25, 2016) at 137.

The trial court's reasoning is similar to the Supreme Court's reasoning in *Gefeller*, that "[t]o close the door after receiving only a part of the evidence not only leaves the matter suspended in air at a point markedly advantageous to the party who opened the door, but might well limit the proof to half-truths." 76 Wn.2d at 455. The trial court's reasoning is not so outside the range of acceptable choices that no reasonable person could arrive at the same outcome. *Rohrich*, 149 Wn.2d at 654. Therefore, we determine that the trial court did not abuse its discretion by determining that defense counsel had opened the door to some further testimony regarding the argument between Bruce and Sanchez.

14

2. Balancing Probative Value/Prejudicial Effect

Bruce asserts that the trial court abused its discretion by determining that the prejudicial effect of the testimony regarding the argument over Bruce's prior assault did not outweigh its probative value. We agree.

Even when a defendant opens the door to otherwise inadmissible evidence, that evidence is still subject to other rules of evidence, including ER 403. ER 403 states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." For example, in *State v. Smith*, our Supreme Court considered whether evidence admitted after the defendant opened the door was unduly prejudicial and did not find that "allowing such testimony [was] substantially outweighed by the danger of unfair prejudice" under ER 403. 115 Wn.2d 434, 442-44, 798 P.2d 1146 (1990). Consistently with *Smith*, *Washington Practice* states that

> the admissibility of evidence through the "open door" often turns on Rule 403 and a balancing of the proponent's need to rebut the opponent's evidence against the risk of further prejudice that may result from the introduction of otherwise inadmissible evidence to rebut the opponent's evidence.

5 KARL B. TEGLAND, WASH. PRAC., *Evidence, Law & Practice* § 103.14, at 73-74 (6th ed. 2016) (footnote omitted).

Evidence may be unfairly prejudicial if it excites an emotional rather than a rational response by the jury or when it promotes a decision on an improper basis. *State v. Haq*, 166 Wn. App. 221, 261, 268 P.3d 997 (2012). We review a trial court's balancing of the prejudicial effect against the probative value of particular evidence for an abuse of discretion. *State v. Barry*, 184 Wn. App. 790, 801, 339 P.3d 200 (2014). A trial court abuses its discretion if its decision is manifestly unreasonable, or is exercised on untenable grounds or for untenable reasons. *Rohrich*, 149 Wn.2d at 654. A decision is based on untenable grounds or made for untenable reasons if it

rests on facts unsupported by the record or was reached by applying the wrong legal standard. *Id*. A decision is manifestly unreasonable if the court, despite applying the correct legal standard to the supported facts, reaches an outcome that is outside the range of acceptable choices, such that no reasonable person could arrive at that outcome. *Id*.

In this case, the trial court determined that while testimony that the argument involved the prior conviction of assault in the second degree would be unfairly prejudicial, testimony that the argument involved merely assault would not outweigh the testimony's probative value. However, any confusion caused by defense counsel's questioning of Sanchez regarding her emotional reaction to her argument with Bruce could have been remedied by means other than disclosing that the argument was over Bruce's prior assault of Sanchez. At trial, the State argued that defense counsel's questioning led the jury to believe that "Ms. Sanchez just became upset over some sort of transfer[red] anger towards her husband, her ex-husband, and that's simply not the case." VRP (May 25, 2016) at 127. Insofar as the confusion stemmed from whether Sanchez was angry at her ex-husband or Bruce, the trial court could have remedied that ambiguity without permitting prejudicial references to Bruce's prior assault.

In addition, because Bruce was charged with assaulting Sanchez, testimony that he had previously assaulted the same victim raises concerns that the jury was induced to find Bruce guilty based on his prior acts. Division Three of this court has noted that evidence of prior bad acts "present[] a danger that the defendant will be found guilty not on the strength of evidence supporting the current charge, but because of the jury's overreliance on past acts as evidence of his character and propensities." *State v. Slocum*, 183 Wn. App. 438, 442, 333 P.3d 541 (2014).

Also pertinent, our Supreme Court explained in *State v. Gunderson* that "courts must be careful and methodical in weighing the probative value against the prejudicial effect of prior acts

in domestic violence cases because the risk of unfair prejudice is very high." 181 Wn.2d 916, 925, 337 P.3d 1090 (2014). The court held that "[t]o guard against this heightened prejudicial effect, we confine the admissibility of prior acts of domestic violence to cases where the State has established their *overriding probative value*, such as to explain a witness's otherwise inexplicable recantation or conflicting account of events." 181 Wn.2d at 925 (emphasis added).

In this case, the testimony regarding Bruce's prior assault did not have overriding probative value in light of the alternative means available to remedy any confusion as to whether Sanchez was upset at her ex-husband or Bruce. We hold that the trial court abused its discretion by permitting testimony regarding Bruce's prior assault because the probative value of that testimony was substantially outweighed by the danger of unfair prejudice.[5]

3. Harmlessness

Having shown that the trial court abused its discretion by permitting testimony about his prior assault, Bruce must also show that the error was not harmless. *State v. Briejer*, 172 Wn. App. 209, 228, 289 P.3d 698 (2012). We have previously held that a non-constitutional evidentiary error will merit reversal only if there is a reasonable probability that the error materially affected the outcome of the trial. *Id.* Stated another way, we will consider an error harmless if the improper evidence is relatively minor or insignificant when compared to all of the evidence admitted at trial. *Id.* In this case, only Bruce and Sanchez were present for the assault, and the jury was left to determine which version of events seemed more credible. The fact that the improper testimony related to Bruce's prior assault of Sanchez is particularly concerning, as the jury may have been tempted to rely on his prior act as evidence of his character and

---

[5] Because the State has abandoned its argument regarding res gestae on appeal, we do not consider whether such testimony would have been admissible as an exception to ER 404(b).

propensities. *Slocum*, 183 Wn. App. at 442. Considering our Supreme Court's observation in *Gunderson*, 181 Wn.2d at 925, that evidence of prior acts of domestic violence in a domestic violence case carries a substantial risk of unfair prejudice, we hold that there is a reasonable probability that the error affected the outcome of the trial.

C.      Prosecutorial Misconduct—Comment on Silence

Bruce asserts that the State committed misconduct by commenting on his silence after he was read his *Miranda* rights during cross examination. We agree.

1.  Impropriety

To establish a claim of prosecutorial misconduct, Bruce must demonstrate that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012), *cert. denied*, 136 S. Ct. 357 (2015). To establish prejudice, there must be a substantial likelihood that the misconduct affected the jury verdict. *Id*. Because Bruce did not object at trial, his arguments are waived unless he can establish that the misconduct was so flagrant and ill-intentioned that an instruction would not have cured the prejudice. *Id*. We review allegations of prosecutorial misconduct under an abuse of discretion standard. *State v. Lindsay*, 180 Wn.2d 423, 430, 326 P.3d 125 (2014).

The Fifth Amendment to the United States Constitution guarantees that "'[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'" *State v. Pinson*, 183 Wn. App. 411, 416, 333 P.3d 528 (2014). Article I, section 9 of the Washington Constitution states that "'[n]o person shall be compelled in any criminal case to give evidence against himself.'" *Pinson*, 183 Wn. App. at 416-17. Both provisions safeguard a defendant's right to be free from self-incrimination, including the right to silence. *Pinson*, 183 Wn. App. at 417. The

right to silence includes both pre-arrest and post-arrest silence, that is, before and after *Miranda* rights are read. *Id.*

Generally, the Fourteenth Amendment's guarantee of due process prohibits impeachment based on post-arrest silence, even if the defendant testifies at trial. *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976); *State v. Burke*, 163 Wn.2d 204, 217, 181 P.3d 1 (2008). However, both the United States Supreme Court and our Supreme Court have recognized an exception to this general principle if the defendant opens the door to impeachment by commenting on his own silence. *United States v. Robinson*, 485 U.S. 25, 31-32, 108 S. Ct. 864, 99 L. Ed. 2d. 23 (1988); *State v. Jones*, 111 Wn.2d 239, 249, 759 P.2d 1183 (1988). The State may not use the defendant's silence as evidence of substantive guilt. *Burke*, 163 Wn.2d at 217. We have noted that "[m]ore specifically, it is improper for the State to make closing arguments that infer guilt from the defendant's silence." *Pinson*, 183 Wn. App. at 417.

If the State references a defendant's silence, we must determine whether the State manifestly intended the reference to be a comment on the right to silence or a mere reference to silence. *Burke*, 163 Wn.2d at 216. A comment on silence violates the defendant's constitutional right to silence and occurs when the State "invites the jury to infer guilt from the invocation of the right of silence." *Id.* at 217. However, the State merely references a defendant's silence if the reference was subtle and brief enough that it did not naturally and necessarily emphasize the defendant's testimonial silence. *Id.* at 216.

The excerpts of Bruce's cross-examination set out above show that the State brought out that Bruce had declined to speak with Deputy Potis and by doing so had lost the opportunity to convey to Potis information favorable to Bruce. The State's questioning ended with the following exchange:

19

[State]: But you waived that opportunity?
[W]: I guess.
[State]: And the reason you did that is because you knew that you had strangled her; isn't that true?
[W]: Not true.

VRP (May 25, 2016) at 219-20.

Although much of the State's cross examination related to whether or not Bruce had an opportunity to provide his version of the events, the State's question about strangulation exceeded the boundaries of proper impeachment. The United States Supreme Court has explained that "[c]ommon law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted." *Jenkins v. Anderson*, 447 U.S. 231, 239, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980). Much of the State's cross examination can be characterized as impeaching Bruce on the issue of whether he had an opportunity to talk with law enforcement. However, the State's comment that Bruce did not talk with Deputy Potis because he had strangled Sanchez went beyond a reference to Bruce's silence and suggested a reason for his silence to the jury: that he had assaulted Sanchez as charged. We have previously held that "[t]he State may not use a defendant's silence to 'suggest to the jury that the silence was an admission of guilt.'" *State v. Knapp*, 148 Wn. App. 414, 420, 199 P.3d 505 (2009) (quoting *State v. Lewis*, 130 Wn.2d 700, 707, 927 P.2d 235 (1996)). Therefore, given the context of the State's questioning, the prosecution impermissibly commented on Bruce's silence.

2. Prejudice

In addition to demonstrating misconduct, Bruce must also show that the misconduct resulted in prejudice. *In re Glasmann*, 175 Wn.2d at 704. To establish prejudice, there must be a substantial likelihood that the misconduct affected the jury verdict. *Id.* We review allegedly

improper arguments in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given.  *State v. Russell*, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994).

In this case, much of the jury's verdict was determined by whether they found Bruce's version or Sanchez's version of the incident more credible because they were the only two who witnessed the entire event.  In *Pinson*, we found that the State had committed prejudicial misconduct under the circumstances of that case where "[t]he State essentially asked the jury to find that Pinson's silence was an admission of guilt, and argued that such an admission was sufficient to convict him."  183 Wn. App. at 420.  While the State did not overtly argue to the jury that Bruce's silence was evidence of his guilt, the State's question to Bruce "[a]nd the reason you did [not give a statement] is because you knew that you had strangled her," invited the jury to infer Bruce's guilt on the basis of his silence.  VRP (May 25, 2016) at 220.  Although the State acknowledged to the jury that "[e]veryone has a right to remain silent, and that is a constitutional right, and it's very important," the reminder rings hollow in light of the State's earlier invitation to the jury to infer guilt from Bruce's silence.  VRP (May 25, 2016) at 266.

Finally, in closing, the State highlighted Bruce's silence and credibility in the context of his prior conviction for assaulting Sanchez.  As mentioned above, our Supreme Court has noted that evidence of prior acts carries a particularly high risk of unfair prejudice in domestic violence cases.  *Gunderson*, 181 Wn.2d at 925.  Therefore, we hold that under the circumstances of this case Bruce has demonstrated that he was prejudiced by the State's misconduct.

3. Flagrant and Ill-intentioned

Because Bruce did not request a curative instruction, he must also show that the State's misconduct was so flagrant and ill-intentioned that it could not have been remedied by an

21

instruction. An objection is unnecessary in cases of incurable prejudice because there has essentially been a mistrial, with a new trial being the only remedy. *State v. Emery*, 174 Wn.2d 741, 762, 278 P.3d 653 (2012). Our Supreme Court has held that certain comments calculated to inflame the passions of the jury are not amenable to curative instruction. *Id*. at 762-63. The court has also reasoned that

> where evidence is admitted which is inherently prejudicial and of such a nature as to be most likely to impress itself upon the minds of the jurors, a subsequent withdrawal of that evidence, even when accompanied by an instruction to disregard, cannot logically be said to remove the prejudicial impression.

*State v. Suleski*, 67 Wn.2d 45, 51, 406 P.2d 613 (1965). Analogizing the improper prejudicial evidence to a harpoon, the court in *Suleski* concluded, "We are not assured that the evidentiary harpoon here inserted could effectively be withdrawn. It was equipped with too many barbs." 67 Wn.2d at 51.

In this case, the State implicitly invited the jury to infer guilt from Bruce's silence and referenced his silence during its closing argument which also incorporated references to Bruce previously assaulting Sanchez. Although the jury is presumed to follow its instructions, we are not convinced that the jury would have been able to disregard the inference suggested by the prosecution. We hold that the misconduct could not have been cured by an instruction to the jury and that Bruce has demonstrated prosecutorial misconduct.

Because we hold that the State committed prosecutorial misconduct, in addition to holding that the trial court abused its discretion by admitting testimony of Bruce's prior assault, we do not reach the remainder of Bruce's arguments, other than appellate costs.

D.      Appellate Costs

Bruce asks us to exercise our discretion to deny any appellate costs the State requests. Because Bruce prevails on appeal, we need not consider this request.

No. 49058-7-II

## CONCLUSION

We reverse Bruce's convictions and remand for a new trial consistent with this opinion.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Bjorgen, C.J.

We concur:

Worswick, J.

Johanson, J.

23